Kristina Aiad-Toss (OH 0101336) *Admitted Pro Hac Vice*
Brian Colón (NM 14624) *Pro Hac Vice Forthcoming*
Pilar Borneo (NM 153971) *Pro Hac Vice Forthcoming*
Meagan Verschueren (CA 313117) *Pro Hac Vice Forthcoming*
Katie Llamas (CA 303983) *Pro Hac Vice Forthcoming*
SINGLETON SCHREIBER
6501 Americas Pkwy #670
Albuquerque, NM 87110
Tel. (505)515-4745
ktoss@singletonschreiber.com
bcolon@singletonschreiber.com
pborneo@singletonschreiber.com
mverschueren@singletonschreiber.com
kllamas@singletonschreiber.com

Carol Montgomery Merchasin (MA 55672) *Pro Hac Vice Forthcoming*
MERCHASIN LAW
2300 Walnut Street #702
Philadelphia, PA 19103
Tel. (609) 666-8553
Carol@MerchasinLaw.com

Larry E. Coben (SBN 015673)
JoAnn Niemi (SBN 020873)
ANAPOL WEISS
8700 E. Vista Bonita Drive, Suite 268
Scottsdale, Arizona 85255
Tel. (480) 515-4745
lcoben@anapolweiss.com
jniemi@anapolweiss.com
Minute Entries: ME@anapolweiss.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| JOSHUA LILLY,<br><br>Plaintiff,<br><br>vs. | Case No.______________________<br><br>**COMPLAINT FOR DAMAGES** |

GLOBAL COMMUNITY COMMUNICATIONS ALLIANCE; ESTATE OF VAN OF URANTIA aka GABRIEL OF URANTIA aka GABRIEL OF SEDONA aka PRINCE MELFAX aka TALIASVAN aka ANTHONY JOSEPH DELEVIN; NANCY "NIÁNN" EMERSON CHASE; TIYIENDEA DELLERBA aka STACY LEE MYSZKA; CATHERINE "CENTRIA" LILLY; CELINAS RUTH; SOULISTIC MEDICAL INSTITUTE; AVALON UNIVERSAL ENTERPRISES, INC. d/b/a ARC ROOFING d/b/a EARTH HARMONY BUILDERS; GCCA ELDERS I–X and DOES I–X.

Defendants.

COMES NOW Plaintiff Joshua Lilly by and through his attorneys, Singleton Schreiber, Merchasin Law, and Anapol Weiss for his Complaint against Defendants, states as follows:

## I. INTRODUCTION

1. This civil action arises from a long-running scheme by Defendants Global Community Communications Alliance ("GCCA") and its leaders to obtain unpaid labor and maintain total control over community members through systems of coercion, physical and social isolation, abuse of authority, and the systematic use of fear.

2. Plaintiff Joshua Lilly ("Plaintiff" or "Mr. Lilly") built the buildings that held him prisoner. Over roughly a decade, he worked for GCCA as a licensed general contractor, directing the construction of the compound in which he was confined. He built the houses in which families were separated from their children, the halls in which leaders conducted sessions designed to break members down, and the structures that generated revenue for GCCA's many business ventures. He was never paid a wage. He never held the money his labor earned. He never had the freedom to stop. The compound that Defendants own and operate today stands because Plaintiff was compelled to build it, and it became the place where his parents' devotion

to the leader displaced their responsibility to their son, the place that kept his wife and children from him, and the place where his young son died.

3. Mr. Lilly was brought into the closed world of Defendant GCCA by his parents as a child of approximately twelve years old. GCCA is a secretive, insular community now in Santa Cruz County, formerly in Sedona, controlled by a self-proclaimed prophet, his wives, and a circle of hand-selected elders.

4. Among those elders were his own parents, whose allegiance ran not to their son but to the leader who called himself Van of Urantia, also known as Gabriel of Urantia, Gabriel of Sedona, Prince Melfax, TaliasVan, the reincarnation of George Washington and Alexander the Great , but at his birth in Pittsburgh, Pennsylvania in 1948, was named Anthony "Tony" Delevin ("Delevin"). For Mr. Lilly, the ordinary refuge of family was foreclosed from the start: the two people who should have protected him were themselves leaders of the organization that exploited him.

5. Within that closed world, Defendants engineered not only physical isolation, in which access to the outside world was limited, but also a system of coercion designed to break members down, isolate them psychologically, and make them dependent on the very people who were extracting their labor. Surveillance was constant, punishments were severe, and obedience to GCCA leadership was mandatory.

6. Members, including Mr. Lilly, were separated from their children, deprived of all autonomy, forced into uncompensated labor, and denied independent access to money. Medical care was forbidden without direct approval by an elder; when Mr. Lilly broke his finger, he was required to wait for GCCA elders to approve the necessary treatment. Mr. Lilly was constantly

threatened with catastrophic consequences for resistance, consequences which were frequently enacted.

7. Defendants worked to ensure that departure from the community would carry consequences so severe that leaving would not be a realistic option. As a condition of Mr. Lilly's membership, Defendants required him to execute a written document providing that if he ever left GCCA, his children would remain in the custody of the parent staying within the organization, or in the custody of GCCA itself, if neither stayed. These were not idle threats. They were credible threats that GCCA had demonstrated it was willing and able to carry out — and did carry out when Mr. Lilly was expelled.

8. To the outside world, Defendants concealed the true nature of GCCA's labor practices, misrepresented the voluntariness of members' participation, and enforced silence through fear of retaliation, shunning, and permanent separation from children and community.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, specifically the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581, 1584, 1589, 1590, and 1595. Section 1595 confers a private right of action on victims of forced labor and trafficking.

10. This Court has personal jurisdiction over Defendants because the corporate Defendants operate in and transact business in the state of Arizona; living individual Defendants reside in Arizona, the Estate of Delevin is subject to jurisdiction in Arizona where the decedent was domiciled and his estate is administered, and because the acts and omissions giving rise to Plaintiff's claims occurred in Arizona.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because one or more Defendants reside in this District. The GCCA compound and the conduct alleged herein are located in Santa Cruz County, Arizona, which lies within the Tucson Division of the District of Arizona.

## III. IDENTITY OF THE PARTIES

12. Mr. Lilly, currently a resident of Cottonwood, Arizona, was born on November 13, 1978. He was brought into the GCCA community in Sedona, Arizona in 1990 at approximately age twelve. He was expelled at approximately sixteen in 1994. He returned to GCCA in 2006 and remained until his final forced departure in November 2016. Throughout his 2006-2016 residency, Mr. Lilly performed extensive uncompensated labor for GCCA and its affiliated ventures, including serving as GCCA's licensed general contractor. As a direct and proximate result of Defendants' wrongful conduct, Mr. Lilly has suffered and will continue to suffer economic injury, emotional distress, pain and suffering, and other actual and consequential damages.

13. Defendant Global Community Communications Alliance ("GCCA") is an Arizona non-profit corporation operating a closed, communal compound in Santa Cruz County. GCCA was the primary beneficiary of the forced labor alleged herein. GCCA knowingly benefited, financially and otherwise, from the uncompensated value of members' labor, including the construction of its physical compound and infrastructure and the revenue generated by members' work for GCCA and its affiliated commercial and nonprofit ventures. GCCA obtained and retained this labor through the coercive mechanisms described throughout this Complaint.

14. Defendant The Estate of Anthony Joseph Delevin is named pursuant to A.R.S. §§14-3110 and 14-3703. Delevin was the founder, spiritual leader, and controlling authority of GCCA until his death in August 2025. The Estate can be served via its personal representative Defendant TiyiEndea Delevin DellErba a/k/a Stacy Myszka.

a. Delevin exercised ultimate authority over GCCA's structure, doctrine, finances, labor systems, family arrangements, discipline, and affiliated entities. Under his direction, members were denied meaningful autonomy and were compelled to perform labor for GCCA and its affiliated ventures.

b. Delevin directed the deployment of members across GCCA's commercial and nonprofit operations and enforced compliance through coercive mechanisms including economic dependency, surveillance, mandatory counseling, family separation, disciplinary programs, and threats of serious harm for resistance or exit.

c. Through these acts Delevin directed and managed the affairs of GCCA and established and maintained the system through which members' labor was obtained and controlled.

15. Delevin and each individual Defendant described below exercised authority within GCCA's leadership structure ("GCCA Leadership") and participated in the operation or management of GCCA by directing, supervising, or implementing the policies and practices through which GCCA maintained control over members and obtained their labor. Each Individual Defendant either obtained Plaintiff's labor through the coercive means described herein, or knowingly benefited, financially and otherwise, from participation in the venture that did so.

16. Defendant Nancy Emerson Chase, ("Chase") also known within GCCA as Niánn, is a co-founder and senior member of GCCA Leadership. Chase exercised authority over major areas of GCCA operations, including family structure, discipline, and labor practices affecting GCCA members. Chase participated in the leadership meetings where operational decisions affecting the community were made and possessed direct, organization-wide knowledge of GCCA's labor practices, its disciplinary and control mechanisms, and its internal handling of misconduct. Chase knew, or in the exercise of reasonable care should have known, that members including Mr. Lilly were compelled to perform uncompensated labor through coercion, and she knowingly benefited from that labor. Through her authority within GCCA Leadership, Chase directed and participated in the management of GCCA operations and affiliated businesses and in maintaining the institutional systems through which GCCA exercised control over members and obtained their labor.

17. Defendant, TiyiEndea Delevin DellErba ("DellErba") also known as Stacy Myszka, is an elder and a member of GCCA Leadership and one of Delevin's wives and principal lieutenants. DellErba exercised authority over members' family relationships, labor assignments, discipline, and compliance with leadership directives. She occupied a senior leadership position immediately beneath the top tier of GCCA authority and issued or relayed directives through subordinate elders and supervisors. During Mr. Lilly's residency, DellErba was placed in authority over GCCA's construction operations — the same operations he led as a licensed general contractor. Through her leadership authority and enforcement role, DellErba directed and implemented policies designed to maintain control over members and to ensure the continued extraction of their labor.

18. Defendant Catherine J. Lilly, ("Catherine Lilly") also known as Centria, is an elder within GCCA Leadership and served as a principal manager of GCCA's financial and operational systems. Catherine Lilly controlled financial matters including lines of credit, property acquisitions, tax matters, and financial administration across multiple GCCA-affiliated ventures.

19. Catherine Lilly is Mr. Lilly's mother. Through that family relationship, she exercised uniquely powerful coercive influence over Mr. Lilly, directing sustained campaigns of guilt, fear, and spiritual pressure designed to induce his return to the community following his first expulsion as a 16-year-old child. Later, Catherine Lilly developed a relationship with Mr. Lilly's wife Jodell Lynn Race ("Race") and encouraged her toward membership in GCCA. Catherine Lilly did so at the direction of, and in coordination with, GCCA Leadership as part of GCCA's effort to recruit both Race and Mr. Lilly back into the community.

20. Through her financial, operational, and familial authority in the GCCA organization, Catherine Lilly directed GCCA activities and participated in the disciplinary session in which Mr. Lilly was ordered to leave the community, the coercive family separation imposed on him, and the legal proceedings filed against him upon his departure.

21. Defendant Celinas Ruth ("Ruth") is an attorney who was a member of GCCA Leadership and served the organization in legal matters. She drafted and administered the custody documents Mr. Lilly was required to sign upon entry and upon departure — instruments that ensured any member who left GCCA would forfeit custody of his or her children — and she participated in the custody and divorce proceedings filed against Mr. Lilly in August 2016 following his expulsion in the summer of 2016. Through these instruments and proceedings, GCCA used legal process, and the threat of legal process, as a means of obtaining and

maintaining members' labor and preventing their departure. Through the abuse and threatened abuse of law and legal process, and through her participation in GCCA Leadership, Ruth reinforced GCCA's coercive control over members' family relationships and ability to leave the organization and thereby contributed to the operation of the systems that enabled GCCA to obtain and retain members' labor.

22. GCCA Elders I–X are individuals whose identities are presently unknown or whose full legal names are not yet confirmed, who participated in, supervised, or enforced GCCA's systems of coercion, labor extraction, discipline, and control.

23. Defendant Soulistic Medical Institute ("Soulistic") is an Arizona nonprofit corporation, EIN 16-1748771, operating a Medicare-certified hospice and healing center under the trade names Soulistic Hospice and Soulistic Healing Center, which are registered to and owned by Defendant GCCA. Soulistic operates in Santa Cruz and Pima Counties, Arizona. Soulistic does not operate as an independent entity. It functions as an instrumentality of GCCA. Soulistic's sole director is Defendant Nancy "Niánn" Emerson Chase, a co-founder and leader of GCCA, and its officers include Defendant Chase (director and president/secretary) and Defendant Catherine Lilly (chief financial officer), both members of GCCA Leadership. Upon information and belief, Defendant Delevin was involved in the leadership and operations of Soulistic.

a. Soulistic knowingly benefited financially and otherwise, from Mr. Lilly's labor, including several years remodeling the buildings that house Soulistic's hospice offices and medical-practice facilities.

b. Soulistic knew that this labor was compelled through the coercive mechanisms described throughout this Complaint.

c. Soulistic through its officers, Defendants Delevin, Chase and Catherine Lilly who were simultaneously GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms. Soulistic continues to occupy and create revenue from Mr. Lilly's uncompensated work.

24. Defendant Avalon Universal Enterprises, Inc. ("Avalon") is an Arizona domestic for-profit corporation, operating under the trade names DBA Earth Harmony Builders (ROC #230898) and DBA ARC Roofing (ROC #232335). Avalon operates in Santa Cruz and Pima Counties, Arizona. Upon information and belief, Avalon does not operate as an independent entity. It functions as an instrumentality of GCCA. Avalon's sole director is Defendant Catherine Lilly, a leader of GCCA, and its officers include Defendant Chase (president) and Defendant DellErba (vice president), both members of GCCA Leadership. Upon information and belief, Defendant Delevin was involved in the leadership and operations of Avalon.

a. Avalon knowingly benefited financially and otherwise, from Mr. Lilly's labor.

b. Earth Harmony Builders, a construction entity wholly owned and operated through Avalon and GCCA, benefitted from thousands of hours of unpaid labor through which Mr. Lilly directed design and construction of 40+ structures on the compound, supervising a crew of ~12–15 members.

c. ARC Roofing, a roofing entity wholly owned and operated through Avalon and GCCA, benefitted from hundreds of hours of unpaid labor from Mr. Lilly's trafficking where he ran the business as a licensed roofing contractor from approximately 2007 to 2015, serving outside customers and generating an estimated $200,000–$300,000 in revenue — all of which was surrendered to GCCA.

d. Avalon knew that this labor was compelled through the coercive mechanisms described throughout this Complaint.

e. Avalon through its officers, Defendants Delevin, Catherine Lilly, and DellErba who were simultaneously GCCA Leadership, obtained and retained the benefit of that labor through those same mechanisms. Avalon continues to occupy and create revenue from Mr. Lilly's uncompensated work.

25. Defendants Does 1-50 are persons or entities whose identities are unknown, but who participated in, facilitated, benefited from, or aided and abetted the unlawful conduct alleged herein.

## IV. GCCA BACKGROUND AND BENEFICIARY STRUCTURE

### A. The Organization

26. GCCA is a closed, hierarchical organization operating on a fenced compound of approximately 227 acres outside Tumacácori, in Santa Cruz County, Arizona, together with affiliated properties and operations in other locations. GCCA presents itself publicly as a spiritual community and nonprofit organization, but in reality, it functions as a coercive, high-demand, high-control organization in which members are required to perform extensive uncompensated labor for the benefit of GCCA and its leadership and are kept there by numerous institutionalized systems of coercion.

27. GCCA was founded in 1989 (at that time it was called Aquarian Concepts Community) by Defendant Delevin, who portrayed himself as a prophet, a reincarnated historical figure, an extraterrestrial being, and a holder of divine authority. Members were required to bow as if to royalty when he entered a room. Delevin exercised complete control over members' daily

lives, finances, relationships, family structures, labor assignments, and access to basic necessities until his death in August 2025.

28. Delevin led GCCA with his wife, co-founder, Defendant Nancy "Niánn" Emerson Chase, and his additional "wife," Defendant Stacy DellErba, who served as his seconds-in-command. A hand-selected group of approximately ten "elders" formed the third tier of the hierarchy. Through this structure, GCCA Leadership exercised ultimate supervisory authority over all members and over every significant aspect of their daily lives, including their labor, their finances, their families, their medical care, and their freedom of movement.

29. Following Delevin's death in August 2025, GCCA Leadership's control structure remained unchanged. On information and belief, Defendants Chase and DellErba continue to exercise the same authority previously held jointly with Delevin, and the same coercive mechanisms, labor systems, and enforcement practices remain in effect.

30. The coercive labor practices described in this Complaint are not recent developments or the conduct of individuals acting outside this community's norms. They are long-standing, institutional features of GCCA and its predecessor organization, Aquarian Concepts Community. The same mechanisms of control and labor extraction have operated for decades, spanning the period of Mr. Lilly's childhood entry, his adult residency, and his final departure, and they continued in effect through the time of filing.

**B. GCCA's Commercial Operations**

31. GCCA operates a constellation of affiliated entities and commercial ventures that generate revenue, content, and other benefits for GCCA and its leadership. These affiliated operations include, without limitation:

a. Soulistic Medical Institute and Soulistic Healing Center

b. Global Alliance Properties

c. Avalon Universal Enterprises

d. Camp Avalon

e. Sea of Glass Center for the Arts

f. Global Change Media

g. Magic Land Realty

h. Food for Ascension

i. Commercial agricultural operations

j. Hemp cultivation and related operations

k. Media production and publishing operations

l. Performance and music-related activities including a recording studio called Future Studios

m. Clothing and resale boutiques including Sacred Treasures and Planetary Family Exchange

n. ARC Roofing

o. Earth Harmony Builders

32. On information and belief, these affiliated entities share management, ownership, or financial control with GCCA Leadership and funnel revenue back to GCCA. They do not operate as genuinely independent; they operate as instrumentalities of the GCCA ventures, staffed by members' uncompensated labor and controlled by the same leadership that governs GCCA itself. On information and belief, many of these businesses are registered under the name Avalon Universal Enterprises, and the profits funnel back to GCCA.

33. Members, including Mr. Lilly, formed the core labor force of GCCA's operations and were assigned to work for profit and nonprofit operations without wages, benefits, or lawful employment protections. Mr. Lilly himself performed unpaid, coerced construction labor for ARC Roofing, Earth Harmony Builders, Magic Land Realty, Soulistic Medical Institute, Soulistic Hospice, Sea of Glass Center for the Arts, Food for Ascension, and Future Studios among many others. Labor assignments were mandatory, directed centrally by GCCA Leadership, and enforced through the same coercive mechanisms that governed all aspects of members' lives. GCCA and its leadership knowingly benefited, financially and otherwise, from this uncompensated labor.

34. The physical compound upon which GCCA's operations are conducted — its buildings, infrastructure, and facilities — was designed and constructed by Lilly and the crew he supervised during his years of uncompensated labor as GCCA's licensed general contractor. Much of the physical property of the businesses owned by GCCA were the recipients of Mr. Lilly's forced labor. The value of his labor is embedded in every aspect of the physical compound GCCA owns and operates today.

## V. INSTITUTIONAL SYSTEMS OF COERCION

35. Throughout his years inside the GCCA community, Mr. Lilly was subjected to a coordinated, interlocking set of institutional systems, not designed to govern a harmonious community, but to eliminate members' ability to refuse labor, assert autonomy, or exit ("Systems of Coercion"). These Systems of Coercion were not incidental. They were engineered and enforced by GCCA Leadership as a unified apparatus of control, and they operated on Mr. Lilly continuously and simultaneously. Each system reinforced the others: isolation, both physical and

informational, created conditions for coercion to flourish, and exhaustion from forced labor made psychological resistance harder.

36. The "chip game" (described below) enlisted the entire community in mutual surveillance, while the counseling system converted that surveillance into discipline. The spiritual authority system gave every punishment a moral face; and the family separation and legal process systems ensured that the cost of exit was catastrophic. Together, these systems constituted the mechanism by which Defendants obtained Mr. Lilly's labor and compliance.

37. It was by these systems that GCCA compelled its members to perform extensive, uncompensated labor as the central purpose of the community's operations. Members were assigned to construction, skilled trades, agriculture, commercial ventures, kitchen service, childcare, and the maintenance of communal residences, without wages, salary, benefits, or any lawful employment protection. Labor assignments were dictated by GCCA Leadership; members did not control whether they worked, what work they performed, the hours they kept, or the conditions of their labor.

38. Refusal or resistance to a labor assignment was not treated as a legitimate exercise of autonomy. It was treated as a disciplinary infraction, and the response was to assign more labor. Exhaustion was not an unintended byproduct of this system — it was an intended feature, ensuring that members had no unstructured hours in which to reflect, plan, or resist. The specific labor extracted from Mr. Lilly — including his service as GCCA's licensed general contractor, his construction of more than forty structures on the compound, his work on the buildings of GCCA's many business ventures, and his schedule of twelve to twenty hours per day, seven days per week — is set forth in the History of Forced Labor section below.

**A. Physical and Informational Isolation**

39. GCCA's physical and informational isolation of its members was the foundation on which every other system of coercion depended. The community was located on a remote compound in the high desert, geographically distant from any town, a location from which members had no independent means of departure.

40. Within the compound, members were denied the tools of connection to the outside world: they had no unmonitored access to telephones, the internet, or outside media, and contact with family, friends, or any person outside GCCA was restricted, monitored, and subject to discipline.

41. Deprived of outside relationships, outside information, and any external point of reference against which to measure their treatment, members were left wholly dependent on GCCA for material survival, social connection, and their very understanding of reality. This was a deliberate mechanism that eliminated members' practical ability to leave, foreclosed any outside source of support or rescue, and amplified the coercive force of every other system described herein.

42. All of this ensured that departure from GCCA was not a matter of walking out. Members who left generally had to escape — planning in secret, concealing their intentions, and leaving with nothing, because any openly expressed desire to leave invited intervention, escalating discipline, and retaliation. Mr. Lilly has personal knowledge of numerous such departures; in the years since his own expulsion, he has assisted approximately ten individuals in escaping GCCA.

**B. Hierarchical Structure and Coercive Control**

43. Authority within GCCA is stratified and absolute. Senior leaders — Delevin (until his death), Chase, and DellErba — issued directives governing all aspects of daily life and labor.

Below them, designated elders such as Catherine Lillyand Ruth, along with other supervisors and enforcers, monitored compliance, assigned work, conducted mandatory counseling sessions, and imposed consequences for perceived disobedience or spiritual deficiency.

44. Advancement within GCCA depended on obedience, labor output, and conformity to organizational expectations. Members' standing was publicly displayed on a "Members List" posted within the compound, showing their hierarchical rank.

45. Demotion on the list resulted from perceived disobedience, insufficient labor, questioning of leadership, or other actions deemed spiritually deficient, and carried severe consequences, including loss of privileges, increased surveillance, mandatory disciplinary programs, and potential separation from family members.

46. GCCA employed designated supervisors, counselors, and handlers who monitored members, implemented discipline, assigned daily labor, restricted access to housing and family contact, and escalated enforcement to leadership when members resisted or questioned directives. These enforcers operated as agents of GCCA Leadership, carrying out policies designed to maintain total control over members and extract maximum labor value.

**C. Spiritual Authority**

47. All determinations of spiritual standing within GCCA were controlled exclusively by Delevin. Delevin alone decided whether a member was spiritually progressing or failing, and those determinations carried direct material consequences for every aspect of a member's life, including housing, labor assignments, family relationships, and community standing.

48. By clothing institutional punishment in the language of divine judgment, GCCA Leadership ensured that discipline felt not like the arbitrary exercise of institutional power but like a necessary and cosmically sanctioned response to a member's own moral deficiency.

**D. The Cosmic Circle Ascension Chip Game**

49. GCCA operated a formal peer-reporting and discipline mechanism known internally as the "Cosmic Circle Ascension Chip Game."

50. Under this system, any community member could report any other member for any perceived failure of conformity, however minor. Reportable conduct was deliberately undefined. A member could be "chipped," reported, and sanctioned for a facial expression, a tone of voice, or any demonstration of dissatisfaction, however subtle.

51. The chip system conscripted the entire community into the work of surveillance and enforcement. Members were not merely *permitted* to report one another — they were *required* to do so. Failure to "chip" another member for perceived non-conformity was itself a "chippable" offense.

52. This mechanism eliminated the possibility of solidarity among members and transformed every peer relationship into a potential monitoring relationship. "Chips" triggered escalating consequences including additional labor assignments, mandatory counseling sessions, and placement in PIRP.

53. Because any lapse in conformity or effort was subject to observation by any member at any time, and because "chips" reliably produced punishment, members understood that non-performance of their labor and any expression of dissent would be seen and sanctioned.

54. The "chipping" system operated to ensure GCCA's labor regime ran smoothly by suppressing dissent before it could form, and compelling members to continue performing labor for GCCA under constant threat of report and reprisal.

**E. The Personality Integration Rehabilitation Program and Debt Bondage**

55. GCCA maintained a formal institutional program called the Personality Integration Rehabilitation Program, known internally as PIRP. Marayeh "Linda" Cunningham ("Cunningham") directed or supervised GCCA's counseling hierarchy and PIRP.

56. On information and belief, Cunningham was previously associated with Synanon and introduced within GCCA methods derived from the confrontational "attack therapy" known as the Synanon Game. As practiced within GCCA, this method was used to monitor members, extract personal information about their lives, relationships, and perceived deficiencies, and enforce submission to leadership directives. Information gathered through PIRP was transmitted to GCCA Leadership and used to coordinate discipline and intervention.

57. Placement in PIRP was presented to members as both a disciplinary response to non-conformity and a source of profound communal shame. Members placed in PIRP were subjected to intensified schedules, increased mandatory counseling, and heightened surveillance, compounding the demands of their existing labor obligations and depriving them of adequate rest.

58. A member placed in PIRP could neither refuse to participate nor escape its sessions, in which he or she was confronted and attacked, often by multiple GCCA figures at once, and taught to regard his or her own objections and perceptions as personal defects. Conducted without limit and sustained over extended periods, this confrontational regimen was designed to, and did, wear down members' capacity for independent judgment and free choice, until continued obedience to GCCA's demands — including its demand for uncompensated labor — no longer felt to the member like a choice he or she was free to refuse. The psychological harm PIRP inflicted was serious enough to compel a reasonable person in the members' circumstances to continue performing labor for GCCA rather than resist or leave.

59. Because PIRP was imposed upon the individual and framed as his or her personal failing, it also disciplined the community as a whole. Members who witnessed its use understood what non-conformity would cost them and were taught to attribute any distress of their own — including the distress of laboring without compensation under coercion — to their own personal deficiency rather than to the conditions GCCA imposed.

60. In this way PIRP secured not only the labor of the member subjected to it, but the continued compliance of every member who might otherwise have questioned the arrangement. GCCA also used PIRP to create debt bondage. Members were told that PIRP participation carried a cost of fifty thousand dollars.

61. Because members had no independent income or assets, having surrendered everything to GCCA, they could not pay. GCCA would characterize the amount as a "scholarship" it had extended on the member's behalf. The purported debt then lay dormant so long as the member remained and continued to labor.

62. If a member attempted to leave, however, the fifty thousand dollars reappeared as a debt GCCA demanded be repaid as a condition of departure or return. Members could not decline PIRP and thus could not decline the debt.

63. Beyond its role in breaking members down, the manufactured debt functioned as a financial barrier to exit, ensuring that departure from GCCA carried not only social and familial consequences but economic ones as well.

**F. Engineered Economic Dependency**

64. GCCA systematically deprived its members of the economic means to leave beginning at entry. Members were required to liquidate all of their assets and turn the proceeds

over to GCCA at entry, so that after joining, a member possessed no savings, no property, and no independent financial resources with which to exit.

65. GCCA further required members to execute documents providing that any money or property a member might later inherit would likewise be surrendered in full to GCCA, foreclosing another avenue by which a member might otherwise accumulate independent means while living within the community.

66. The combined effect was engineered destitution: members were stripped of the resources to leave on entry and prevented from acquiring such resources thereafter, ensuring that departure was not merely emotionally and legally catastrophic but financially impossible.

**G. Mandatory Counseling**

67. GCCA operated a mandatory counseling program administered by Marayeh Linda Cunningham, together with a group of elder handlers assigned to individual members. The counseling program was not therapeutic in any meaningful sense.

68. It functioned as an instrument of compliance designed to reverse blame, suppress dissent, extract confidential disclosures, and enforce GCCA Leadership's directives regarding members' conduct and attitudes. Information that members disclosed in counseling was reported to GCCA Leadership and used to calibrate further discipline.

69. GCCA structured its counseling practices to maximize the institution's power over the member and to deny the member any stable source of support independent of GCCA Leadership. Handlers were deliberately rotated to prevent members from forming trusted relationships, and sessions were frequently conducted not as private meetings but as group proceedings designed to isolate and overwhelm the member. The specific operation of this system upon Mr. Lilly is set forth in the factual allegations below.

**H. Family Separation**

70. GCCA Leadership weaponized the severance of family bonds as an institutional mechanism to punish non-compliance and compel obedience.

71. When a member resisted or questioned leadership, GCCA separated the member from his or her spouse and children through institutional directive — assigning separate counselors to recharacterize the non-compliant member as a danger or spiritual liability, physically relocating the member away from the family, and imposing supervised-visitation requirements under which any contact with a member's own children required prior leadership approval and elder supervision.

72. These measures were not presented as, and did not function as, child-welfare measures; they were instruments of control. The specific application of this system to Mr. Lilly — including his separation from Race and their children, and the supervised-visitation ultimatum that precipitated his expulsion — is set forth in the factual allegations below.

**I. Abuse of Legal Process**

73. GCCA used legal instruments and formal legal process as tools of coercion and control. As a condition of membership, GCCA required parents to execute documents providing that if a parent left the organization, the children of the relationship would remain in the custody of the parent staying with GCCA, or in the custody of GCCA itself.

74. When members were expelled or attempted to leave, GCCA activated formal custody and divorce proceedings against them, conditioned any possibility of return on the surrender of parental rights and the payment of substantial sums of money, and required departing members to execute documents falsely characterizing their departures as voluntary.

75. Requiring the relinquishment of custody was a double-levered scheme: it kept people working and in fear of leaving, and the absolute control that GCCA had over members' children was also used to coerce those who left to return.

76. This use and threatened use of law and legal process to compel labor and compliance, extract financial payment, eliminate parental rights, and impose the costs of exit constituted an abuse of legal process within the meaning of 18 U.S.C. § 1589(a) (3) and was a coordinated, institutionalized feature of GCCA's coercive system.

**J. Mandated Shunning and Apostasy**

77. GCCA maintained and enforced a formal institutional policy governing the treatment of members who left or resisted the community. Departure was characterized within GCCA as apostasy, and former members were treated accordingly.

78. Contact between current members and defectors was prohibited or severely restricted. Members who expressed sympathy for or maintained communication with a departed member risked discipline themselves.

## VI. GCCA'S FORCED LABOR AND COERCION OF MR. LILLY

### A. Mr. Lilly's Entry into GCCA And First Period of Residency 1990 1994

79. Mr. Lilly was brought into the Aquarian Concepts Community at approximately age twelve by his parents. His mother, Catherine Lilly, quickly became a GCCA elder and director, as did his father. His father has since left the community. Mr. Lilly did not choose to enter the organization. He was a child, brought into a closed coercive system by the two people legally responsible for his welfare.

80. From the time of his entry, he was subjected to the coercive systems described above. He was assigned labor, subjected to mandatory communal requirements, and isolated

from outside peers, information, and opportunities. He had little frame of reference for a different life and no ability to leave.

81. At approximately age sixteen, Mr. Lilly was angry because he was not allowed to hang out with certain friends whom Delevin had banned, and he made disparaging remarks about Delevin to his parents. On information and belief, they reported this to Delevin as required, and Mr. Lilly was expelled. His parents purchased a one-way ticket to Hawaii and sent him away with no money, no housing arrangements, and no support beyond a loose plan to stay briefly with a former acquaintance. The acquaintance housed Mr. Lilly for approximately two weeks.

82. Mr. Lilly survived on his own in Hawaii for a year, from approximately age sixteen to age seventeen. Then his mother threatened to report him to law enforcement unless he relocated to Fort Collins, Colorado to live with a religious family she had made an arrangement with. Mr. Lilly complied under threat. Eventually, he relocated to Wyoming and later to Colorado, where he and Race, spent several years trying to build a life together.

**B. Mr. Lilly's Coerced Re-Entry into GCCA in 2006**

83. Throughout the twelve years Mr. Lilly spent outside GCCA, his parents and other family members — all GCCA members — maintained a sustained campaign of coercive pressure designed to compel his return. Mr. Lilly was told repeatedly that the world was ending and if he did not come back, he would be in danger, that his spiritual standing would suffer, and that his place was within the community. This pressure was not casual. It was continuous, deliberate, and delivered by the people Mr. Lilly loved most, who were themselves operating under GCCA's direction and belief system.

84. Mr. Lilly had been barely surviving on his own. Now he wanted to settle down with Race and build a life. But he had not gone beyond the 8th or 9th grade and getting a job that

paid enough to support a family was difficult. In addition, Race had health issues that would require considerable medical attention. He and Race had committed to buying a house but worried about the economics of living their lives.

85. As the house purchase neared completion, Catherine Lilly began to escalate her campaign to get Mr. Lilly and Race to return. She described the community as beautiful, with no bills to pay, work readily available. She encouraged Mr. Lilly to walk away from the house purchase and allow his credit to be ruined. Catherine Lilly assured him that within GCCA every material need would be provided — that he would never again need a credit rating, and that his limited education would not matter.

86. Mr. Lilly was not willing to be a part of the GCCA community again, but he wanted the opportunity to develop a relationship with his family. So, Mr. Lilly and Race walked away from everything in Colorado and returned to the Sedona area where Catherine Lilly cultivated a close relationship with Race, ultimately persuading her to attend a GCCA seminar. After attending the seminar, Race told Mr. Lilly she was joining GCCA with or without him.

87. Faced with the loss of his partner and the prospect of separation from his entire family of origin, Mr. Lilly agreed to rejoin. Mr. Lilly and Race liquidated their remaining assets and donated everything to GCCA as a condition of membership, described by the organization as payment to join. When Mr. Lilly arrived at GCCA, he had nothing. That was by design.

88. Upon re-entering GCCA with Race in the summer of 2006, Mr. Lilly and Race were told they were in an “initiation phase.” Approximately six months later, when the initiation phase ended and they became members, Mr. Lilly and Race were required to execute a document providing that if either parent left GCCA, any children of the relationship would remain in the custody of the parent staying with the organization, or in the custody of GCCA itself.

89. During this same period, GCCA also required Mr. Lilly to execute a document providing that any money or property he might later acquire — including any inheritance, windfall, or other future assets — would be surrendered in full to Delevin and Chase. They alone would decide what to do with it. Mr. Lilly had to sign this document as a condition of membership.

90. GCCA's control over Mr. Lilly's finances extended even further. GCCA prepared and filed federal income tax returns in Mr. Lilly's name — without his involvement, without ever showing him a return, and without his signature. When a refund check issued in his name, Mr. Lilly was handed the check, required to endorse it, and required to surrender it in full to GCCA.

91. This scheme, withholding wages, then filing a tax return in Mr. Lilly's name and seizing the resulting refund, indicates the power that GCCA exerted over Mr. Lilly's identity.

### C. Mr. Lilly's Forced Labor and Coercion from 2006 to November 2016

#### i. Forced Labor and Trafficking

92. Beginning with his first period of residency as a child and continuing through his second period as an adult, Defendants coerced Mr. Lilly to perform extensive unpaid labor for GCCA and its affiliated ventures.

93. Throughout his second residency, Mr. Lilly, who had a general contractor and roofing contractor license, was a builder of the GCCA physical compound. Working primarily through Earth Harmony Builders — a construction entity wholly owned and controlled by GCCA — he directed the design and construction of more than forty structures on the GCCA property, supervising a crew of approximately twelve to fifteen members.

94. Mr. Lilly's labor was not confined to the compound. He operated ARC Roofing, a GCCA-owned roofing business, which he ran as a licensed roofing contractor from approximately 2007 to 2015, working with outside customers, directing roofing crews, and generating an estimated two to three hundred thousand dollars in revenue over those years. He also did extensive remodeling of the properties that were purchased by GCCA and become the organization's Sea of Glass Arts Center.

95. He also inspected and assessed prospective acquisitions for Magic Land Realty, GCCA's real-estate venture, and performed or directed the remodeling of the properties GCCA purchased. Mr. Lilly received no wages for any of this work. All revenue from his outside contracting generated was surrendered in full to GCCA, and the value of every structure he built inured to GCCA and its affiliated ventures.

96. By the time Soulistic Medical Institute opened its Soulistic Hospice facility in 2008, Mr. Lilly had already inspected, assessed, and remodeled the buildings that would house their hospice and medical-practice operations. He remodeled those buildings to meet the requirements of a licensed hospice and medical facility — assessing the scope of work, preparing estimates, and performing or directing demolition, drywall, roofing, concrete, finish work, and painting. This work required Mr. Lilly to understand and apply federal Medicare facility requirements and local building codes, because the buildings could not lawfully operate as a hospice and medical practice otherwise. He performed this work without compensation, and the buildings that resulted — and the revenue Soulistic continues to generate from them — are the direct product of his uncompensated highly skilled labor.

97. Two of the structures Mr. Lilly built illustrate the sophistication of the work GCCA compelled him to perform without pay. The first is the Trinity Dome, a monolithic dome

built by a method that demands substantial engineering skill and precise coordination. In monolithic dome construction, a large-reinforced fabric form (or “airform”) is inflated to the shape of the finished building and held under constant air pressure; polyurethane foam is then applied to the interior of the form, a web of steel reinforcing bar is tied throughout, and structural concrete is sprayed against the reinforcement from within. Mr. Lilly led a crew of approximately ten to twelve members through the construction of the dome — an unforgiving build in which an error in sequencing or air pressure can collapse the entire form. The Trinity Dome stands on the compound today as a permanent product of his uncompensated labor.

98. The second is the Straw Bale House, a multi-use community and residential structure built by straw-bale construction — a specialized natural-building technique in which stacked and pinned straw bales form the structural walls, which are then sealed with lime or earthen plaster and require careful structural detailing and moisture management. As with the dome, Mr. Lilly played a leadership role in managing the crew and serving as the project’s source of construction expertise. Like the Trinity Dome, the Straw Bale House is a standing monument to the sophisticated and highly skilled labor Mr. Lilly was compelled to provide GCCA without pay.

99. In all of these projects, Mr. Lilly’s responsibilities were similar. That included, but was not limited to, planning and budgeting, design , permitting and approvals, interpreting code issues, demolition, site preparation, foundation work, structural framing roofing, addition of windows and doors, interior and exterior finishes, electrical, plumbing, insulation, drywall installation, and interior and exterior painting.

100. Mr. Lilly routinely worked twelve to twenty hours per day, seven days per week, for the duration of his second residency. He did not control whether he worked, what tasks he

performed, the hours he kept, or the conditions under which labor was performed. Work assignments were dictated by GCCA Leadership and enforced through the same coercive mechanisms governing every other aspect of Mr. Lilly’s life.

101. In addition to construction labor, Mr. Lilly performed mandatory agricultural work, community kitchen service for approximately one hundred twenty community members, and cleaning and maintenance of a six-thousand-five-hundred-square-foot communal residence housing approximately twenty-five people. These assignments were not optional and were not compensated. They ran concurrently with Mr. Lilly’s construction work, consuming all available hours.

**ii. Force & Coercion**

102. Because informational isolation was a core mechanism of GCCA's system of coercion, Mr. Lilly was cut off from unmonitored contact with the outside world. The limited connectivity he was permitted, existed only to serve his labor. and he remained under constant surveillance. Mr. Lilly was issued a cellular phone solely because his work in GCCA's construction business required him to communicate by telephone. That phone was not a means of free communication but was rather an instrument of monitoring. When Mr. Lilly telephoned anyone outside the community, he frequently received a call from the GCCA office demanding to know who that person was and why he had contacted them.

103. His internet use was policed the same way. On one occasion, while researching how the community might grow shiitake mushrooms, Mr. Lilly received a call from the GCCA office questioning what he was doing. Through this surveillance, Mr. Lilly knew he could neither communicate nor gather information beyond the community's control, reinforcing the isolation

that made leaving, or even contemplating leaving, feel impossible. He was not permitted to have a device that would allow him to take pictures of his own work..

104. Another element of the coercion Mr. Lilly experienced was PIRP, reference above. It was used to ensure high volume labor output and 100% compliance. An organization that pays its workers uses money and termination to get output and compliance. GCCA needed an enforcement mechanism like PIRP – a system of breaking down autonomy that made “slacking off” and noncompliance costly.

105. Mr. Lilly was not put on PIRP until approximately 2013 but once he was in the program, he never got out. From 2013 onward, Mr. Lilly’s schedule was intensified so that his sleep was reduced to approximately four to five hours per night. He would begin construction work at five o’clock in the morning, and during the day, he would meet with Monroe (“Monroe”) – his “handler” in PIRP – in the morning, noon and night. He was made to do a task list for all of his workers and himself every single day, although it was not at all necessary for his job. After his day job, he did community kitchen cleanup, a mandatory one-hour PIRP counseling session, two hours of mandatory classes from 7:00 – 9:00 pm, house cleaning duties, and required written chip forms, with lights out at approximately midnight.

106. The mandatory counseling to which Mr. Lilly was subjected to as part of PIRP operated as an instrument of control. Mr. Lilly’s counseling handlers were deliberately rotated to prevent him from forming any stable rapport or trusted relationship.

107. But his primary handler was Monroe, who coordinated directly with Cunningham. Counseling sessions were frequently conducted, not as private meetings, but as group proceedings in which Mr. Lilly was placed in the center of a room and surrounded by as many as five elder men — a format designed specifically to maximize the power imbalance between Mr.

Lilly and his interrogators and to strip him of any sense of personal agency or safety. Mr. Lilly learned that resistance or refusal in these sessions would result in escalated sanctions, including additional labor.

108. The Chip Game was another form of coercion that Mr. Lilly experienced. He was "chipped" many times as part of this "game" in which everyone surveilled everyone else. He was "chipped" for asking if he could have his son circumcised after getting permission from the community's doctor to do so. This was considered "bucking authority." He was "chipped" for not chipping others enough, including his wife. He was instructed to "chip" himself more frequently. He was "chipped" for not cleaning the kitchen sufficiently and for saying that the GCCA children were naïve because they were not familiar with the outside world.

109. The "Chip Game" permeated every aspect of Mr. Lilly's life. On both occasions that his wife gave birth, two members of the community were designated to be present in the delivery room. Mr. Lilly knew that because these members lived under the same pressure he did to constantly "chip" others, that their purpose was not to support, it was to be watching for something to "chip."

110. Mr. Lilly continued performing labor assignments throughout his time at GCCA not freely or voluntarily, but because GCCA's Systems of Coercion operated in two directions at once: they extracted his labor, and at the same time they consumed the resources he would have needed in order to leave.

111. He had no financial independence, no credit card, no contacts outside the community, and no unmonitored phone or communication with the outside world. These are the practical resources a person needs to leave. He had none of them.

112. Coercion had sapped his psychological resources as well. He was isolated, sleep-deprived, and overworked. He was subjected to degradation and humiliation through the "chip game", through placement on the PIRP, and through mandatory counseling sessions used as instruments of punishment. He was threatened with debts owed to the organization.

113. He had seen what happened to those who left. They were shunned, declared apostates, and cut off from everyone still inside. And he understood what leaving would cost him: his wife, both of his children, his parents, and the only community he had known since he was twelve. The custody instrument he signed upon entry meant that if he walked out, he surrendered his children permanently.

114. He stayed because the consequences of leaving were overwhelming. These were not hypothetical fears. As set forth below, GCCA imposed every one of them.

**D. The Consequences of Dissent: Family Separation, Custody Coercion, and The Death of Mr. Lilly's Young Child**

115. Mr. Lilly and Race had two children during their residency within GCCA: Vaycion Lilly, born in 2009, and Cleson Lilly, born in 2014.

116. As Mr. Lilly's frustration with GCCA's dysfunction grew, GCCA Leadership activated the family separation mechanism against him. Mr. Lilly's wife was assigned a separate counselor who characterized Mr. Lilly as a danger and a spiritual liability because he was purportedly not progressing spiritually. Mr. Lilly's spiritual standing (based on Delevin's assessment) determined whether he could stay in his marriage and maintain access to his children.

117. Finding Mr. Lilly failing spiritually, the couple was separated by institutional directive. Mr. Lilly was relocated to an isolated Airstream trailer on the compound in the

Arizona desert in the summer of 2016. His wife and both children were moved into a separate household.

118. A representative of GCCA Leadership, Daniel Steinhardt, subsequently informed Mr. Lilly that any contact with his own children required prior approval from GCCA Leadership and had to be conducted under elder supervision. Mr. Lilly's son Vaycion was approximately six years old at the time. Cleson was between eighteen months and two years old. Mr. Lilly refused.

119. Mr. Lilly's refusal to give up his own children was treated as a disciplinary failure. Arlen Monroe, Defendant DellErba, and Catherine Lilly held a session with Mr. Lilly and ordered him to leave the community despite approximately thirteen to fourteen years of combined residency and labor.

120. Mr. Lilly begged to stay for the sake of his children. His request was denied. He was driven to Nogales, Arizona, and left there with nothing — no money, no housing, no employment, no outside social network, and no family. At Ruth's direction, Mr. Lilly was forced to sign a document stating that he was leaving voluntarily, even though his departure was not voluntary.

121. Mr. Lilly was terrified that GCCA would keep him from seeing his children, and that he would lose any connection to his wife. Ruth repeatedly told him that the best course of action was to cooperate with what was being asked of him, that everything would go better if he did. He had no power.

122. Within approximately two weeks of Mr. Lilly's expulsion in the summer of 2016, GCCA, through Ruth, served Mr. Lilly with divorce papers and papers seeking full custody of both children — papers that Race was coerced into signing. Simultaneously, GCCA communicated that Mr. Lilly could return, but only on the conditions of signing over full custody

of both children, executing the divorce papers, and paying fifty thousand dollars. Upon his return, he would be given one year to produce the fifty thousand dollars.

123. Mr. Lilly was broken and he surrendered to supervised visits with his children. His last supervised contact with his younger son Cleson consisted of one hour, conducted under the supervision of an GCCA-appointed supervisor Tarente Baldeschi. At the conclusion of the hour, Baldeschi removed Cleson from Mr. Lilly's arms and escorted Mr. Lilly off the property. That was the last time Mr. Lilly saw his son alive.

124. On August 26, 2016, he received a call informing him that his -son Cleson was dead. From the point of his expulsion just a few weeks earlier, Mr. Lilly had been denied all independent contact with Cleson and had no ability to investigate, to consult with medical personnel independently, or to take any action on behalf of his son while Cleson remained under GCCA's exclusive custody and care.

125. When Mr. Lilly arrived at the scene of his son's death, DellErba responded with a profane verbal attack, telling Mr. Lilly not to question GCCA's leadership authority. Mr. Lilly was permitted to spend one night at the community with his wife. The following morning, Baldeschi ordered Mr. Lilly off the property, telling him he was no longer part of the family.

126. Although GCCA controlled the arrangements for Cleson's funeral, Mr. Lilly was required to pay for the cremation in Tucson. When he arrived at the compound one hour before the scheduled funeral, he was expelled from the property by Tarente Baldeschi. He was permitted to return for the funeral itself but was not included in the program as Cleson's father. He was required to request Delevin's permission to speak at his own son's funeral.

127. After Delevin granted Mr. Lilly permission to give his eulogy, Delevin announced to the assembled community that Mr. Lilly was forgiven and was permitted to return. Every

person in the room — people who had just treated Mr. Lilly with open hostility — shifted instantaneously to warmth and welcome. Delevin then required Mr. Lilly to kneel before him and embrace him at his son's funeral as the price of re-entry.

**E. Mr. Lilly's Return in September and Escape**

128. Mr. Lilly was "permitted" to re-enter GCCA on approximately September 1, 2016, immediately following Cleson's funeral. He had spent part of his childhood and approximately ten years of his adult life inside GCCA with no meaningful outside social network. The prospect of being cut off entirely from his parents, his son, his wife, his colleagues, and every relationship he had maintained for more than a decade was not an abstract threat. It was a concrete and devastating consequence that GCCA Leadership deliberately cultivated and enforced. It served as a warning, not only to Mr. Lilly, but to everyone within the closed community.

129. Mr. Lilly re-entered not only to try to have a community in which to heal from the death of his son, but also because GCCA represented that he would be permitted to fulfill existing outside construction contracts using a community vehicle (with contract proceeds to be signed over to GCCA) and would then be reinstated as a community member.

130. Upon re-entry, GCCA immediately reneged on those representations. Mr. Lilly was denied use of the community vehicle and was informed that he would be classified not as a community member but as a "resident visitor" — the lowest classification within GCCA's hierarchy.

131. Mr. Lilly was simultaneously subjected to a new "three-strike" policy under which any conduct GCCA deemed non-compliant would count toward his removal. Three strikes

were accumulated rapidly: the first when Mr. Lilly attended a pre-approved appointment, and the attendance was retroactively converted into a disciplinary infraction; the second when Mr. Lilly sought medical treatment for a broken finger without prior Elder approval; and the third when Mr. Lilly commented in an evening class that children raised within GCCA were naive about the outside world due to their isolation.

132. The following day, November 13, 2016 — Mr. Lilly's birthday — he was brought into a session with GCCA Elders Monroe and Tarente Baldeschi and told he had to leave. Mr. Lilly left the next day with nothing and has not returned.

**F. GCCA's Retaliation Against and Shunning of Mr. Lilly**

133. Following Mr. Lilly's final departure, GCCA enforced its standard mandated shunning protocols against him. He was treated as an apostate. His family members remaining inside the organization — including his mother Catherine Lilly — were prohibited from or refrained from maintaining normal contact with him.

134. Delevin repeatedly referenced Mr. Lilly by name during Sunday services, characterizing him as a cautionary example of spiritual failure and apostasy. This public denunciation, paradoxically, made Mr. Lilly known throughout the community as a person who would help members who wished to leave. Over the years following his final departure, Mr. Lilly assisted approximately ten people in escaping GCCA, including his own father and former wife.

135. GCCA's shunning and narrative control practices were applied to Mr. Lilly as they are applied to all defectors — standardized institutional mechanisms designed to isolate

those who leave, deter others from exiting, and reinforce the authority of GCCA Leadership within the closed community, all for the purpose of labor extraction.

## VII. PLAINTIFF'S DAMAGES

136. Mr. Lilly has suffered substantial damages, including but not limited to:

a. the fair market value of more than ten years of uncompensated skilled construction labor and outside contracting work;

b. loss of wages and the economic value of labor performed;

c. assets surrendered upon entry into GCCA;

d. destruction of credit resulting from GCCA's coercive recruitment;

e. legal costs and consequences of GCCA-initiated custody and divorce proceedings;

f. severe emotional distress;

g. the grief, trauma, and consequential harm associated with the loss of his son Cleson;

h. ongoing anxiety, and

i. psychological injury requiring treatment; and

j. such other economic and non-economic damages as will be proven at trial.

137. These harms are recoverable in full under 18 U.S.C. § 1595.

## CAUSES OF ACTION

**Count I: Civil Liability Under 18 U.S.C. § 1595(a) for Forced Labor in Violation of 18 U.S.C. § 1589 (Against All Defendants)**

138. Plaintiff realleges and incorporates by reference all preceding paragraphs.

139. Defendants knowingly provided or obtained Plaintiff's labor and services by the means prohibited under 18 U.S.C. § 1589(a), including by force, threats of force, physical restraint, and threats of physical restraint in violation of 18 U.S.C. § 1589(a)(1).

140. Defendants obtained Plaintiff's labor by means of serious harm and threats of serious harm within the meaning of 18 U.S.C. § 1589(a)(2). Serious harm includes physical, psychological, financial, and reputational harm, and encompasses the threats of family separation, loss of parental rights, spiritual condemnation, financial ruin, and community shunning that Defendants held over Plaintiff.

141. Defendants obtained Plaintiff's labor by means of the abuse or threatened abuse of law and legal process in violation of 18 U.S.C. § 1589(a)(3). This included requiring Plaintiff to sign a custody-stripping document upon entry; filing formal custody and divorce proceedings against Plaintiff upon his expulsion; demanding fifty thousand dollars as a financial condition of re-entry; and requiring Plaintiff to execute an exit document prepared by GCCA's attorney Defendant Ruth.

142. Defendants obtained Plaintiff's labor by means of a scheme, plan, or pattern intended to cause Plaintiff to believe that, if he did not perform such labor, he would suffer serious harm, in violation of 18 U.S.C. § 1589(a)(4). The Systems of Coercion described herein — including the PIRP, the chip system, the mandatory counseling apparatus, the spiritual authority system, the family separation system, and the supervised visitation ultimatum — together constituted such a scheme, plan, or pattern.

143. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1589, and pursuant to 18 U.S.C. § 1595(a), Plaintiff suffered economic and non-economic harm, including loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**Count II: Civil Liability Under 18 U.S.C. § 1595(a) for Trafficking with Respect to Forced Labor in Violation of 18 U.S.C. § 1590 (Against All Defendants)**

144. Plaintiff realleges and incorporates by reference all preceding paragraphs.

145. Defendants violated 18 U.S.C. § 1590 by knowingly recruiting, harboring, transporting, providing, and obtaining Plaintiff for labor and services in violation of the TVPRA.

146. Defendants knowingly recruited Mr. Lilly for labor within the meaning of 18 U.S.C. § 1590. His re-entry was not a free choice. It was the product of a long coercive campaign directed at a young vulnerable man who had been expelled from his family as a teenager, cut off from outside relationships, and subjected to sustained psychological pressure by the people he most wanted to be reunited with.

147. Throughout the twelve years Mr. Lilly spent outside GCCA, his parents and other family members — all GCCA members acting under GCCA's direction — maintained a continuous campaign designed to compel his return, telling him the world was ending, that he would be in danger, and that his spiritual standing would suffer if he did not come back. Defendant Catherine Lilly escalated that campaign as Mr. Lilly and his partner Race neared buying a home, cultivating a relationship with Race and ultimately persuading her to join GCCA, so that Mr. Lilly faced the loss of his partner and separation from his entire family of origin if he did not rejoin. The targeting of his partner and the exploitation of his desire for family were the means by which Defendants recruited him back into the labor regime.

148. Defendants knowingly harbored Mr. Lilly for labor within the meaning of 18 U.S.C. § 1590. Upon his return in 2006, Defendants confined Mr. Lilly within GCCA's closed, fenced compound of approximately 227 acres in the remote high desert, from which members had no independent means of departure, and subjected him to physical and informational

isolation, constant surveillance, and monitored communications that eliminated his practical ability to leave.

149. Defendants maintained that confinement through the same interlocking Systems of Coercion that governed every aspect of his life, holding him within the community so that his labor could continue to be extracted.

150. As a condition of that recruitment and harboring, Defendants required Mr. Lilly to liquidate his remaining assets and donate everything to GCCA as purported payment to join, so that when Mr. Lilly arrived, he had nothing — an outcome Defendants engineered by design to foreclose any practical ability to leave. Through these acts, Defendants obtained and provided Mr. Lilly for the uncompensated labor described throughout this Complaint.

151. Defendants undertook this recruitment, harboring, and obtaining knowingly and in furtherance of the forced-labor violations of 18 U.S.C. § 1589, and for the purpose of securing Mr. Lilly's continued uncompensated labor for GCCA and its affiliated ventures.

152. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1590, and pursuant to 18 U.S.C. § 1595(a), Plaintiff suffered economic and non-economic harm, including loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**Count III: Civil Liability Under 18 U.S.C. § 1595(a) for Peonage in Violation of 18 U.S.C. § 1581 (Against All Defendants)**

153. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

154. Section 1581(a) prohibits holding or returning any person to a condition of peonage — that is, compelling a person to perform labor or services to work off a real or purported debt or obligation.

155. Defendants held Mr. Lilly in a condition of peonage. Through the acts and omissions described throughout this Complaint, Defendants compelled Mr. Lilly to perform continuous uncompensated labor — including his service as GCCA's licensed general contractor, his construction of more than forty structures on the compound, and the operation of GCCA's roofing and construction businesses — while manufacturing and holding over him a debt he could never discharge.

156. Defendants engineered that debt through the PIRP program, telling members that participation carried a cost of fifty thousand dollars characterized as a "scholarship." Because members had surrendered all assets to GCCA and had no independent income, they could not pay; the purported debt lay dormant while the member remained and labored and reappeared as a sum GCCA demanded as a condition of departure or return.

157. Defendants further stripped Mr. Lilly of the economic means to satisfy any obligation independently or to leave, requiring him to liquidate and surrender all assets upon entry, to surrender any future inheritance or windfall, and to surrender in full the revenue his outside contracting generated. The combined effect was to bind Mr. Lilly to continued labor in service of a debt and obligation to GCCA.

158. Defendants held Mr. Lilly to this compelled service through physical, psychological, and legal coercion, and threats thereof, including the Systems of Coercion described above — isolation, surveillance, the manufactured debt, family separation, and the

abuse and threatened abuse of custody and legal process — which made leaving without discharging the debt impossible as a practical matter.

159. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1581, and pursuant to 18 U.S.C. § 1595(a), Plaintiff suffered economic and non-economic harm, including loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**Count IV: Civil Liability Under 18 U.S.C. § 1595(a) for Involuntary Servitude in Violation of 18 U.S.C. § 1584 (Against All Defendants)**

160. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

161. Section 1584(a) prohibits knowingly and willfully holding any person to a condition of involuntary servitude.

162. Defendants knowingly and willfully held Mr. Lilly in a condition of involuntary servitude for approximately a decade, from his coerced re-entry in 2006 through his final forced departure in November 2016, compelling him to perform unpaid work for GCCA and its affiliated ventures without wages and without the practical freedom to stop or to leave.

163. Defendants obtained and maintained that servitude through force, threats of force, and a climate of physical, psychological, and legal coercion — not through Mr. Lilly's free choice. Mr. Lilly did not control whether he worked, what tasks he performed, the hours he kept, or the conditions of his labor; work assignments were dictated by GCCA Leadership and enforced through the coercive mechanisms governing every aspect of his life.

164. These coercive mechanisms — physical and informational isolation on a remote compound, constant surveillance, the confrontational PIRP program, the manufactured debt, engineered economic dependency, family separation, and the abuse and threatened abuse of custody and legal process — operated together to compel Mr. Lilly to remain and to labor, and to make departure carry consequences so severe that leaving was not a realistic option.

165. Defendants weaponized Mr. Lilly's family bonds to enforce his servitude, separating him from his wife and children by institutional directive, conditioning contact with his own children on leadership approval and elder supervision, and using custody instruments and formal custody and divorce proceedings to raise the cost of exit and coerce continued compliance.

166. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1584, and pursuant to 18 U.S.C. § 1595(a), Plaintiff suffered economic and non-economic harm, including loss of the value of his labor, loss of earning capacity, severe emotional distress, and ongoing psychological injury, and is entitled to recover damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**Count V: Civil Liability Under 18 U.S.C. § 1595(a) — Beneficiary Liability for Violations of 18 U.S.C. §§ 1589, 1590, 1581, and 1584 (Against All Defendants)**

167. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

168. Plaintiff Joshua Lilly is a victim of forced labor, trafficking, peonage, and involuntary servitude within the meaning of 18 U.S.C. §§ 1589, 1590, 1581, 1584, and 1595(a), and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. § 1595(a)

against any person or entity that knowingly benefited, or received anything of value, from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

169. Defendants – GCCA, its leadership, and its operations – constituted a venture within the meaning of 18 U.S.C. § 1595(a). The venture was not a passive arrangement or an ordinary commercial exchange; it was a continuous, coordinated undertaking through which Defendants together operated GCCA's compound and its affiliated commercial and nonprofit enterprises, extracted the uncompensated labor of members including Mr. Lilly, and channeled the resulting revenue and property value back to Defendants and its leadership. Each Defendant took part in that venture and provided active, ongoing support to it, and their sustained relationship reflects a common undertaking and a tacit agreement among them to obtain and profit from coerced labor.

170. Through the acts and omissions described throughout this Complaint, each Defendant knowingly benefited, financially and by receiving things of value, from participation in that venture. The venture obtained the direct value of Mr. Lilly's labor — including the more than forty structures he designed and built on the compound, the buildings of GCCA's business ventures that he constructed and remodeled, the estimated two to three hundred thousand dollars in outside contracting revenue that was surrendered in full to GCCA, and the assets he surrendered to GCCA — and each Defendant knew it was benefiting in some way from participation in the venture.

171. Each Defendant knew or, in the exercise of reasonable care and diligence, should have known that the venture was engaged in the provision of forced labor and other violations of the TVPRA against Mr. Lilly and other members. In particular:

a. Defendant GCCA was the primary beneficiary of the forced labor and obtained and retained the value of that labor through the coercive mechanisms described throughout this Complaint.

b. The Estate of Delevin is liable for the conduct of Delevin, who directed the deployment of members across GCCA's commercial and nonprofit operations, established and maintained the system through which members' labor was obtained and controlled, and enforced compliance through the coercive mechanisms alleged herein.

c. Defendants Chase, DellErba, and Catherine Lilly, as members of GCCA Leadership, directed and participated in the management of GCCA's operations and affiliated businesses, possessed direct, organization-wide knowledge of GCCA's labor and coercive-control practices, and knowingly benefited from Mr. Lilly's uncompensated labor.

d. Defendant Ruth, as an attorney and member of GCCA Leadership, drafted and administered the custody instruments and participated in the custody and divorce proceedings through which GCCA used legal process to obtain and maintain members' labor and prevent their departure, and thereby knowingly facilitated and benefited from the venture.

e. Defendant Soulistic Medical Institute, an instrumentality of GCCA whose officers are members of GCCA Leadership and Defendants in this action, knowingly benefited from Mr. Lilly's uncompensated labor remodeling the buildings that house its hospice and medical-practice facilities, knew that labor was compelled

through the coercive mechanisms described herein, and continues to occupy and generate revenue from his work.

f. Defendant Avalon Universal Enterprises, d/b/a Earth Harmony Builders and ARC Roofing, an instrumentality of GCCA whose director and officers are members of GCCA Leadership and Defendants in this Action, knowingly benefited from hundreds of hours of Mr. Lilly's unpaid labor building the compound and running its roofing business, and knew that labor was compelled through the coercive mechanisms described herein.

172. The affiliated entities named as Defendants do not operate as genuinely independent businesses. They function as instrumentalities of GCCA, are staffed by members' uncompensated labor, are controlled by the same leadership that governs GCCA, and funnel their profits back to GCCA — such that their participation in and benefit from the venture is inseparable from GCCA's own.

173. Defendants and their agents thus had a direct association with those who obtained Mr. Lilly's forced labor and knowingly facilitated that conduct, which, as shown more thoroughly in the incorporated allegations above, reflects a continuous relationship among the Defendants such that the pattern of conduct appears to be a tacit agreement among them.

174. Violations of 18 U.S.C. § 1595(a) by Defendants as "beneficiaries" operated jointly with the other unlawful acts and omissions alleged in this Complaint to cause Mr. Lilly to suffer substantial economic loss, physical harm, and psychological injury, and all other damages alleged herein, because of being subjected to forced labor and exploited for the benefit of GCCA and its affiliated ventures. Pursuant to 18 U.S.C. § 1595(a), Plaintiff is entitled to recover

damages, including compensatory and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**Count VI: Vicarious Liability for TVPRA Violations *(Against GCCA, Avalon, and Soulistic)***

175. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

176. Under the TVPRA and federal common law, an entity is vicariously liable for the acts and omissions of its officers, directors, and agents committed within the scope of their authority, and each member of a joint venture is liable for the acts and omissions of the other members committed in furtherance of the venture.

177. Under the TVPRA and federal common law, an entity is also liable for the acts and omissions of its alter ego — a nominally separate entity or person that it dominates and uses as an instrumentality to accomplish a wrong.

178. Defendants Delevin, Chase, DellErba, Catherine Lilly, and Ruth acted as the actual agents of Defendant GCCA when committing the wrongful acts and omissions alleged herein. Each held a leadership role within GCCA, exercised control over and managed the day-to-day operations of GCCA, and directed, supervised, or implemented the policies and practices through which GCCA obtained and retained Mr. Lilly's labor.

179. Defendant GCCA is therefore vicariously liable for the TVPRA violations of Defendants Delevin, Chase, DellErba, Catherine Lilly, and Ruth, each of whom held leadership roles in, exercised control over, managed the day-to-day operations of, and received or directed revenues from GCCA.

180. Defendant Avalon Universal Enterprises, d/b/a Earth Harmony Builders and d/b/a ARC Roofing, is vicariously liable for the TVPRA violations of its director and officers who

were simultaneously members of GCCA Leadership — Defendant Catherine Lilly, Avalon's sole director, Defendant DellErba its vice president, and Defendant Chase, its president — who acted as Avalon's agents in obtaining and benefiting from Mr. Lilly's uncompensated construction and roofing labor.

181. Defendant Soulistic Medical Institute is vicariously liable for the TVPRA violations of its officers who were simultaneously members of GCCA Leadership — Defendant Chase, its director, president, and secretary, and Defendant Catherine Lilly, its chief financial officer — who acted as Soulistic's agents in obtaining and benefiting from Mr. Lilly's uncompensated labor remodeling its hospice and medical-practice facilities.

182. Additionally, on information and belief, Defendants GCCA, Avalon, and Soulistic participated in a joint venture with one another and with Defendants Delevin, Chase, DellErba, Catherine Lilly, and Ruth to operate the compound and the affiliated businesses through which Mr. Lilly's labor was extracted.

183. The venture's operations were highly integrated across GCCA, Avalon, Soulistic, and the other affiliated businesses; the participants shared the revenue and profits generated from those businesses and from Mr. Lilly's forced labor; and they exercised mutual control over the labor-trafficking venture, including the trafficking and forced labor of Mr. Lilly.

184. Avalon and Soulistic did not operate as genuinely independent businesses but as instrumentalities of GCCA, controlled by the same leadership, such that they functioned as a single, integrated enterprise and as alter egos of GCCA and of one another.

185. As a direct and proximate result of the foregoing, and pursuant to 18 U.S.C. § 1595(a), Defendants GCCA, Avalon, and Soulistic are liable for the TVPRA violations alleged in Counts I through V and for all damages caused to Plaintiff thereby, including compensatory

and punitive damages, together with reasonable attorneys' fees and costs, and all other relief this Court deems just and proper.

**PUNITIVE DAMAGES**

186. Plaintiff realleges and incorporates the allegations above, as if fully set forth herein.

187. Plaintiff is entitled to punitive damages under the applicable statutes against Defendants, and each of them, for each and every cause of action alleged herein, as a result of Defendants' outrageous, wanton, willful, and malicious conduct underlying Plaintiff's claims. *See Ditullio v. Boehm*, 662 F.3d 1091 (9th Cir. 2011).

**JOINT AND SEVERAL LIABILITY**

188. "Joint and several liability "applies when there has been a judgment against multiple defendants." If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recovers only once for the full amount.

189. Federal law allows an injured party to sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing, without regard to his proportion of fault and even if the concurrent negligence of others contributed to the incident.

190. Plaintiff alleges each Defendant should be held joint and severally liable to Plaintiff for the totality of his injuries and damages alleged herein.

**ATTORNEYS FEES**

191. Plaintiff is entitled to recover his costs and reasonable, necessary, or customary attorneys' fees from Defendants under the applicable statutes. *See* 18 U.S.C. § 1595(a).

192. All conditions precedent to Plaintiff's recovery of his costs and attorneys' fees have occurred or will occur prior to entry of judgment in this suit.

**DISCOVERY RULE**

193. To the extent defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. From 2006 and through at least November 2016, Plaintiff was under coercion and control of Defendants.

194. While he was under the control of Defendants and for many years after, Plaintiff through no fault of his own – lacked the information to bring claims because he did not know both his injuries and the cause of his injuries. This lack of information was due to no fault on the part of Plaintiff but rather was a direct result of Plaintiff being kept under the control of Defendants and the impact of the control and abuse in the following years.

195. At the time Plaintiff was being subject to forced labor and trafficking and for many years following his escape, he did not know that he was a victim of human trafficking as the term is defined by law, that his injuries arose from being trafficked by Defendants or that he was a person trafficked, much less that he was being victimized by a human trafficking venture, and he did not discover and was not in position to discover the legal cause of his injuries while under the control of the Defendants.

196. In February 2026, Plaintiff first realized he was a victim of human trafficking and forced labor after learning what forced labor and human trafficking was. Prior to that date, Plaintiff was aware he was harmed and abused but did not recognize that he was a survivor of

human trafficking or a victim of forced labor. Prior to that date, the Plaintiff did not understand what labor trafficking or forced labor was.

197. Therefore, Plaintiff did not discover and could not have reasonably discovered the legal cause of his injuries since realizing his status as a victim of human trafficking as the term is defined by law.

198. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the Doctrine of Equitable Tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of his own, that prevented him from pursing his legal remedies including but not limited to the filing of a lawsuit. Plaintiff's claims are timely and do not result in prejudice to Defendants.

199. To the extent that Defendants assert an affirmative defense of limitations, Plaintiff also invokes the Continuing Tort Doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct. Plaintiff was subject to continuous trafficking by Defendants through November 2016, which is not more than 10 years before Plaintiff filed this lawsuit.

200. This continuous trafficking resulted from Defendants continuous facilitation of trafficking of Plaintiff at its compound and throughout its businesses operations and Defendants ongoing venture with one another to extract forced labor from Plaintiff by means of force and coercion.

**DEMAND FOR JURY TRIAL**

201. Plaintiff hereby demands a trial by jury as to all matters so triable.

**PRAYER**

202. For these reasons, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for:

a. All economic damages to which he is entitled;

b. All actual damages to which he is entitled;

c. All incidental and consequential damages to which he is entitled;

d. All mental anguish and emotional distress damages to which he is entitled;

e. All restitution damages to which he is entitled;

f. All unjust enrichment damages to which he is entitled;

g. All exemplary, treble, and/or punitive damages;

h. Attorneys' fees and costs of suit;

i. Pre-judgment and post-judgment interest at the highest rate allowed by law; and

j. All other relief to which he is or may be entitled in law or in equity.

**RESPECTFULLY SUBMITTED** this 23rd day of July 2026.

*/s/ Larry E. Coben, Esq*
Larry E. Coben (SBN 015673)
JoAnn Niemi (SBN 020873)
ANAPOL WEISS
8700 E. Vista Bonita Drive, Suite 268
Scottsdale, Arizona 85255
Tel. (480) 515-4745
lcoben@anapolweiss.com
jniemi@anapolweiss.com
Minute Entries: ME@anapolweiss.com

Kristina Aiad-Toss (OH 0101336) *Pro Hac Vice Forthcoming*
Brian Colón (NM 14624) *Pro Hac Vice Forthcoming*
Pilar Borneo (NM 153971) *Pro Hac Vice Forthcoming*
Meagan Verschueren (CA 313117) *Pro Hac Vice Forthcoming*
Katie Llamas (CA 303983*) Pro Hac Vice Forthcoming*
SINGLETON SCHREIBER
6501 Americas Pkwy #670
Albuquerque, NM 87110
Tel. (505)515-4745
ktoss@singletonschreiber.com
bcolon@singletonschreiber.com
pborneo@singletonschreiber.com
mverschueren@singletonschreiber.com
kllamas@singletonschreiber.com

Carol Montgomery Merchasin (MA 55672) *Pro Hac Vice Forthcoming*
MERCHASIN LAW
2300 Walnut Street #702
Philadelphia, PA 19103
Tel. 609-666-8553
Carol@MerchasinLaw.com